UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| JEFFREY A. ELLIOTT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:18-CV-169-RLW |
| ) | |
| ANDREW SAUL, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant.[1] ) | |
| ) | |

## **MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying the application of Jeffrey A. Elliott ("Elliott") for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

### I.  Background

On July 29, 2015, Elliott filed an application for DIB (Tr. 256) and SSI (Tr. 263). The claim was initially denied on March 24, 2016. (Tr. 132-41). Elliott's request for a hearing was granted, and a hearing before an Administrative Law Judge (ALJ) was held on October 4, 2017. (Tr. 29-71). The ALJ issued a written decision on March 14, 2018, upholding the denial of benefits. (Tr. 7-25). On May 11, 2018, the Appeals Council of the Social Security Administration

---

[1] Andrew Saul is now the Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul should be substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g)

denied Elliott's request for review of the ALJ's decision (Tr. 1). The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Elliott filed this appeal on July 11, 2018. (ECF No. 1). On January 14, 2019, Elliott filed a Brief in Support of his Complaint. (ECF No. 15). The Commissioner filed a Brief in Support of the Answer on April 11, 2019. (ECF No. 22).

## II. Decision of the ALJ

The ALJ found that Elliott had the following severe impairments: epilepsy, major depressive disorder, and adjustment disorder. (Tr. 13). The ALJ, however, determined that Elliott did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 14). The ALJ found that Elliott had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: Elliott can never climb ladders or scaffolds; Elliott must avoid all hazards of heights; Elliott can perform repetitive work according to set procedures, sequence, or pace; Elliott can perform some complex tasks (further defined as SVP 5 and below). The ALJ found that Elliott can perform past relevant work as a Refrigeration Tester because he has specialized training in heating and air conditioning and is not limited by the physical and mental demands of this work. (Tr. 18). Ultimately, the ALJ determined that Elliott is not under a disability and denied his claim for benefits.

## III. Administrative Record

The following is a summary of relevant evidence before the ALJ.

### A. Hearing Testimony

Elliott testified on October 4, 2017, as follows:

2

Elliott is 55 years old and divorced. (Tr. 32). He has been living in a house with his sister and brother-in-law since the middle of July. (Tr. 32-33). Previously, he lived with his father until he passed away in the fall of 2009. (Tr. 33). Elliott's sister filed a claim for disability benefits as well. His brother-in-law is a musician. (Tr. 33).

Elliott quit school in the 11th grade to work. (Tr. 34). He obtained his GED. (Tr. 34). He is right handed, 5 feet and 11 inches tall, and weighs one hundred and ninety-five pounds. (Tr. 34). He knows how to read, write, and perform simple math. (Tr. 34). His sister has a computer at home, but Elliott does not use it. (Tr. 34-35). He does not have a cell phone. (Tr. 35). He last had a phone in 2012 and previously used his ex-wife's computer. (Tr. 35). Elliott has a daughter, aged twenty-five years old, and a son, aged twenty years old. (Tr. 35). Elliott is now caught up on child support but previously was in arrears in 2012. (Tr. 35-36).

Elliott's wages have never been garnished; his state privileges (such as driving and hunting) have never been suspended; he never served in the military. (Tr. 36). He was in jail previously on a sexual misconduct charge. (Tr. 36-37). He pleaded guilty and was sentenced to probation for five years. (Tr. 36-37).

Elliott is not currently working. (Tr. 37). He is on food stamps and has Health Net. (Tr. 37). He last worked in 2011 as a journeyman installer and service technician for Matthew Heating and Cooling, an HVAC company in St. Louis, Missouri. (Tr. 37-38). He left the HVAC company because of his seizures. (Tr. 38). He had to lift up to fifty pounds as part of his employment. (Tr. 38). He also worked for Martin Service Company, Classic Air Care, and Matter Family Holdings performing the same kinds of HVAC work and with the same fifty-pound lifting requirement. (Tr. 39). Elliott worked for Husband Corporation for twenty years. For the last three year there, Elliott was a lab technician who tested commercial refrigerators. (Tr. 39-40).

3

Elliott cannot work because he has seizures. (Tr. 41-42). He was diagnosed with seizures around 2001 or 2002. (Tr. 42). He worked several years after his diagnosis, but the seizures have increased since then. (Tr. 42). He has grand mal seizures that last two and a half or three hours around three times per month. (Tr. 42). Elliott takes Keppra for his seizures. (Tr. 42). He was last hospitalized for a seizure about a month ago, and he had to got o the emergency room at Southeast Missouri Hospital. (Tr. 42). He was taking his Keppra at the time. (Tr. 42-43). Last year, Elliott had testing done by neurologist Dr. Chandra at the Raleigh Neurology Pain and Sleep Center.

Elliott also cannot work because of his carpal tunnel syndrome. (Tr. 43-44). On his wrists, Elliott wears soft splints that were prescribed by a neurologist. (Tr. 44). He usually only wears them in the evening. (Tr. 44).

Elliott has varicose veins in his left leg. He has never had surgery on them, but he wears compression stockings. (Tr. 44). He has not worn the compression stockings for three years because they are expensive to replace. (Tr. 44).

Elliott suffers from anxiety but does not currently take any medications for it. (Tr. 45).

Elliot has sleep apnea and uses a BIPAP machine. (Tr. 45). The setting on his BIPAP machine is 16-8. (Tr. 45). He normally uses the BIPAP machine, but he has not in the last two and a half months because he is "getting relocated." (Tr. 45-46).

Elliott was treated for depression but is not currently under a doctor's care for depression. (Tr. 46).

Elliott takes Lisinopril for high blood pressure. (Tr. 46).

He has never had any 24-hour testing for seizures in hospitals. (Tr. 46).

Elliott does not recall an instance where he needed a note that stated that he could not work for purposes of his state child support obligations. (Tr. 46-47). Similarly, Elliott did not recall why the state was supposed to take his driver's license away. (Tr. 47). Elliott never saw anyone for treatment after being diagnosed with adjustment disorder with some mixed anxiety and depression. (Tr. 47).

His medication makes him extremely tired all the time. (Tr. 48). He does not smoke. (Tr. 48). He quit using alcohol around 2007 or 2008. (Tr. 48). He last used marijuana and cocaine 25 or 30 years ago. (Tr. 48-49).

Elliott has a driver's license but does not drive. (Tr. 49). His sister drove him from Branson, Missouri. (Tr. 49). Elliott cooks simple meals for himself. (Tr. 49). He washes dishes every couple of weeks. (Tr. 49). He does his own laundry. (Tr. 49). He has his own room and makes his bed. (Tr. 50). He has gone to the grocery store with his sister. (Tr. 50).

After his father died, Elliott's sister picked him up from Cuba and moved him to Branson. (Tr. 50-51). Elliott moved some of his belongings to Branson. (Tr. 51). Elliott got a "small inheritance" from his father's estate. (Tr. 51).

Elliott can walk for 15 or 20 minutes. He can stand for five minutes. (Tr. 51). He can sit for several hours. (Tr. 52). He can lift 15 pounds. (Tr. 52). He can only walk for 20 minutes and stand for five minutes because of exhaustion and confusion. (Tr. 52). No doctor has put a limit on Elliott's walking, standing, sitting or lifting. (Tr. 52).

Elliott has problems with left leg swelling, particularly when he is standing or walking. (Tr. 53). Elliott wore support hose when he was working to compress his varicose veins and provide better leg functioning. (Tr. 53). Now, Elliott raises his feet for several hours at a time to treat the swelling in his leg. (Tr. 54).

Elliott has been diagnosed with an allergy to mold. (Tr. 54). He has trouble breathing, which worsens when the mold count is high. (Tr. 55).

Elliott had surgery on his hand when he was 29 years old because he had difficulty picking up items. (Tr. 55). He remains unable to perform repetitive tasks with his hands. (Tr. 56). He has been diagnosed with carpal tunnel syndrome since 2013 when Dr. Chandra performed a nerve conduction study. (Tr. 56).

Elliott take Keppra, an epilepsy medication. (Tr. 58).[2] He previously took Dilantin, another epilepsy medication. (Tr. 58).[3] He switched to Keppra when Dilantin was no longer able to control his seizures. (Tr. 58-59). Elliott stopped using his BIPAP machine a few months ago. (Tr. 59).

After his seizures, Elliott experiences extreme confusion, his muscles are sore, and he is disoriented. (Tr. 59). He has a little less of a recovery time for the smaller seizures than the grand mal seizures. (Tr. 59).

Elliott tries to perform repairs, but he must rest his arms or change positions every ten to fifteen minutes. (Tr. 60). He must sit for several hours before he can stand or walk for a short while. (Tr. 60).

Elliott has not had any recent treatment for varicose veins. (Tr. 61). He last received treatment for his varicose veins a year ago in 2016 at Dr. Chandra's office. (Tr. 61). Elliott claims his carpal tunnel has not been as much of a problem because he stopped working. (Tr. 62).

In December 2015, Elliot had a head injury from a fall and was caring for his 88-year-old father. (Tr. 62). Elliott cooked for his father and helped him pick out movies. (Tr. 62). Elliott did not help his father bathe or dress. (Tr. 62-63).

---

[2] https://www.webmd.com/drugs/2/drug-18053/keppra-oral/details. (last visited 8/22/19).
[3] https://www.webmd.com/drugs/2/drug-4157/dilantin-oral/details (last visited 8/22/19).

6

Testimony from Vocational Expert George Horn:

The Judge asked Vocational Expert George Horn to imagine an individual with Elliott's education, training, and work experience. The first hypothetical individual could never climb ladders and scaffolds, must avoid all hazards of heights, could perform repetitive work according to set procedures, sequence and pace, could perform some complex tasks defined as Specific Vocational Preparation ("SVP") 5 work and below. Horn testified that the first hypothetical individual could perform Elliott's past work as a refrigeration tester. (Tr. 65). This first individual could also perform work as a dryer attendant. (Tr. 68).

The second hypothetical person would have the same qualifications and abilities as the first hypothetical person, except he would be able to perform only light work, could climb stairs and ramps frequently; stoop, kneel, crouch, crawl, push and pull with arms and legs in all directions, including overhead reaching; avoid concentrated exposure to extreme cold and vibrations (such as jack hammers or other equipment where the operator is significantly vibrating) and must avoid hazardous machinery (such as punch presses, saws, etc.). Horn stated the second individual would still be able to perform Elliott's past work as a refrigeration tester. (Tr. 67). Horn testified this individual could also perform work as a production assembler. (Tr. 68).

The third hypothetical person would have the same qualifications as the second individual (including light work), but this person could only occasionally climb stairs and ramps, occasionally stoop, kneel, crouch and crawl. (Tr. 68). Horn testified the third individual would still be able to perform the same jobs as provided for the first hypothetical person. (Tr. 68).

### IV. Legal Standard

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails

7

to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities ... ." *Id.* "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[4] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his RFC. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008); *see also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant

---

[4] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

8

can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. *Id.*; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step 5.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id.*; *see also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Id.*; *see also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This Court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*,

294 F.3d 1019, 1022 (8th Cir. 2002); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

## V. Discussion

### A. Evaluation of Elliott's RFC

Elliott contends that the ALJ failed "to properly evaluate the evidence as a whole, which led to an unsupportable RFC assessment". (ECF No. 15 at 11). Therefore, Elliott maintains that the hearing decision was "not supported by substantial evidence and should be reversed." (ECF No. 15 at 11).

The ALJ identified objective medical evidence that did not support the severity of Elliott's alleged physical symptoms. (Tr. 13-14, 17-18). For example, Elliott complained of carpal tunnel syndrome (CTS), but the ALJ noted Elliott's EMG/NCV testing indicated his condition was only "moderate" and Elliott had near-full grip strength. (Tr. 13, 371, 393). The

10

ALJ further found that Elliott's clear chest x-rays, normal oxygen saturation, and clear lungs belied his complaint of breathing problems. (Tr. 14, 17, 677, 700, 984). Thus, the ALJ found that the evidence supported a finding that Elliott's CTS and chronic obstructive pulmonary disease (COPD) were non-severe. (Tr. 13-14).

The ALJ found that Elliott's epilepsy was severe, but not disabling. (Tr. 13, 17). The Court holds that the ALJ properly relied on multiple diagnostic tests and that the record provided no "evidence showing a significant degree of muscle atrophy, paravertebral muscle spasm, sensory or motor loss, reflex abnormality, gait disturbance, or reduced range of motion of the spine or joints" that would substantiate disabling functional limitations. (Tr. 17, 538, 549, 604, 612).

In addition, the Court notes that Elliott's medical providers generally took a conservative approach, which undercuts his claims of severe impairments. (Tr. 13-15). The ALJ explained that Elliott's history of hypertension, varicose veins, obstructive sleep apnea, CTS, and COPD did not require aggressive treatment, and had minimal effect on his functional abilities to perform work-related tasks. (Tr. 13-14).

The ALJ determined that claimant's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation. (Tr. 15). The ALJ found Elliott had only mild limitation in interacting with others, noting that he lived amicably with his father until his father's recent death and now lives amicably with his sister and brother-in-law. Similarly, the ALJ found that Elliott had moderate limitations in concentrating, persisting, or maintaining pace based upon Elliott's examination by Dr. Beezley. (Tr. 15). The ALJ noted that Elliott performed numerous activities of daily living that required concentration to perform, including driving. (Tr. 15).

11

Moreover, the ALJ found that Elliott had only mild impairments with adapting or managing himself, given that he was able to drive, manage his financial affairs, and like without assistance. (Tr. 15).

Finally, the ALJ explained that Elliott's ability to perform daily activities was inconsistent with his claims of debilitating symptoms. (Tr. 14-15, 17). As previously discussed, Elliott lived with and cared for his father, performed self-care, helped with cleaning and laundry, shopped in stores, got along with others, and did not require special reminders. (Tr. 295-98, 303). *See Bryant v. Colvin*, 861 F.3d 779, 783 (8th Cir. 2017) (ALJ considered inconsistencies between Bryant's complaints, personal history, and the medical record and determined his daily activities did not support a finding of disability); *Reece v. Colvin*, 834 F.3d 904, 910 (8th Cir. 2016) (citing *Dunahoo v. Apfel*, 241 F.3d 1033, 1038–39 (8th Cir. 2001)) ("Evidence of daily activities that are inconsistent with allegations of disabling pain may be considered in judging the credibility of such complaints."). Accordingly, the Court holds the ALJ considered this evidence in concluding the record failed to support Elliott's allegation his medical impairments precluded him from working.

As a result, the Court finds that the RFC in his case reflects the ALJ's consideration of Elliott's credible work-related limitations. The ALJ determined that Elliott could perform work at all exertional levels but with the following nonexertional limitations: Elliott could never climb ladders or scaffolds; must avoid all hazards of heights. (Tr. 16). To account for Elliott's mental condition, the ALJ limited Elliott's RFC to repetitive work according to set procedures, sequence or pace and some complex tasks (defined as SVP 5 and below). (Tr. 16). *See* 20 C.F.R. §§404.1568, 416.968; SSR 00-4p. The ALJ found Elliott was able to perform his past relevant work as a refrigeration tester, as he performed the job and as it is generally performed in the

national economy. (Tr. 18). The ALJ came to this conclusion using the sequential evaluation process, by posing hypotheticals to the vocational expert and including only impairments the ALJ found credible and supported by the record as a whole. *Smith v. Colvin*, 756 F.3d 621, 627 (8th Cir. 2014) ("We also conclude that the ALJ properly phrased the hypothetical to the vocational expert, recognizing that a hypothetical need only include impairments that the ALJ finds credible."); *Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir.2004). Based upon testimony elicited from the vocational expert, the ALJ determined that Elliott's limitations did not prevent him from performing his past work and he was not disabled. (Tr. 19).

B.  **Dr. Hardy's Opinion**

Elliott also claims that he could not perform full-time competitive work with the limitations on Elliott's RFC outlined by Dr. Hardy. (ECF No. 15 at 5). Elliott argues that the ALJ did not provide good reasons to discredit Dr. Hardy's opinion.

The ALJ ordered Elliott to undergo a consultative evaluation by a physician to determine Elliott's limitations. On October 28, 2017, Elliott underwent a consultative evaluation by Kade Hardy, D.O. Dr. Hardy wrote:

> The patient did not have any obvious inflammation or swelling in any of his joints. I found no specific joint abnormalities. There is no instability, contracture, or ankylosis in any joint.... The patient does have some mild tenderness in his lumbar region and also displayed some tightness to his paravertebral muscles. The patient's grip strength was normal and he had no issues with fine finger movements. ...The patient did become sidetracked and had to be redirected during the entirety of the history portion of today's examination. It was obvious that he has had some issues with his memory as well, as he is unable to recall specific events. It was difficult for him to stay on task when asked to perform specific tasks during the examination. The patient's gait is unlabored, but he does have a shuffling gait when seen ambulating. I found no specific neurologic abnormality except for what was described earlier. There is not muscle atrophy. There is no motor reflex abnormality seen. There

was no significant or persistent disorganization of motor functioning in any
extremities. The patient did not require the use of any assistance device for
ambulation today. He does have an extensive history of epilepsy with multiple
seizures per month. This also caused him to present to the emergency room
yesterday for further evaluation. It was recommended that he see his neurologist
as well as a sleep specialist regarding his severe sleep apnea.

Based on my observations and physical exam findings as well as the patient's
medical history, his ability to perform and sustain work-related functions such as
sitting, standing, walking, lifting, carrying, and handling objects, as well as
travelling will be significantly limited second to all of his chronic ailments and
particularly his seizure disorder. In terms of hearing and speaking, I see little to
no limitations at this time.

(Tr. 985). Dr. Hardy also opined that Elliott could occasionally lift and carry up to 10 pounds, secondary to his seizure disorder and COPD. (Tr. 986). Dr. Hardy found that Elliott could sit for three hours in an eight-hour day, stand one hour in an eight-hour day, and walk one hour in an eight-hour day. The rest of the time would be spent alternating positions and lying down. (Tr. 987). Dr. Hardy found Elliott could never reach in any direction, handle, finger, feel, or push/pull secondary to his seizure disorder. (Tr. 988).

The ALJ gave Dr. Hardy's "check-block form" little weight because the form "suggests [Elliott] is virtually bedfast, [but] Dr. Hardy's examination paints a completely different picture." (Tr. 17).

Elliott contends that Dr. Hardy's opinion does not consist solely of a checkbox form. Instead, Elliott notes that Dr. Hardy provided three pages of narrative to support his opinion. (ECF No. 15 at 5 (citing Tr. 983-85)).

The Court holds that the ALJ correctly observed a contrast between Dr. Hardy's examination findings and Elliott's self-reported limitations. (Tr. 17-18). Dr. Hardy's opinion statements weighed Elliot's self-interested description more heavily than his own objective

14

findings. For example, Elliott demonstrated full motor strength bilaterally in his upper and lower extremities and walked without assistance or discomfort. (Tr. 984). However, in contrast with these objective findings, Dr. Hardy's opinion limited Elliott to sitting three hours per day, standing or walking one hour per day, and walking no more than 15 minutes at a time. (Tr. 987). These restrictions would make even sedentary work impossible. (Tr. 987). Likewise, the Court holds that the ALJ properly gave little weight to Dr. Hardy's "check-block form" and relied on the examination itself. The ALJ noted that the "Dr. Hardy based the assessed functional limitations solely on the claimant's statements to him during the history." (Tr. 18). The ALJ is not required to include the claimant's subjective statements in his RFC. *See Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) ("Physician opinions that are internally inconsistent, however, are entitled to less deference than they would receive in the absence of inconsistencies."); *Johnson v. Chater*, 87 F.3d 1015, 1018 (8th Cir. 1996) ("Where a treating physician's opinion is itself inconsistent, it should be accorded less deference."). Dr. Hardy's checklist opinion was contrary to the evidence as a whole, including his own narrative, and the ALJ properly evaluated his medical opinion in the context of the entire record. *See* 20 C.F.R. §§404.1527(c)(4), 416,927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."); *see also Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014) ("The ALJ explained Dr. Garlapati's evaluation in the MSS was unsupported by Toland's medical records, daily activities, and work history.").

The Court holds that the ALJ was within his discretion when he determined that Elliott's RFC was not correctly determined by any of the medical records provided to the Court. (Tr. 16). Rather, the ALJ was permitted to develop the RFC based upon the medical records and factual evidence in this case. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011)(citing *Schmidt v.*

15

*Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) ("the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians"). The ALJ chose to credit the objective medical tests and evidence of Elliott's treating and examining physicians, based upon his well-reasoned review of the record. "[T]here is no indication that the ALJ felt unable to make the assessment he did and his conclusion is supported by substantial evidence." *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005); *Martise*, 641 F.3d at 927. Moreover, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016); *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013) (affirming RFC without medical opinion evidence); *Perks v. Astrue*, 687 F.3d 1086, 1092–93 (8th Cir. 2012) (same).

The Court holds that that the ALJ's decision was supported by substantial evidence on the record. *Turpin v. Colvin*, 750 F.3d 989, 994 (8th Cir. 2014). The ALJ did not rely on Dr. Hardy's check block form but evaluated Elliott's own testimony and other medical records. The ALJ therefore did not err in giving Dr. Hardy's check block form less weight where it conflicted with medical records, Dr. Hardy's narrative testimony, and Elliott's account of his daily activities. The ALJ considered Elliott's medical records and testimony, including materials from his treating physicians, as well as the testimony of the medical expert and vocational expert. *Turpin*, 750 F.3d at 994.

### C. Evaluation of Medical Opinions Regarding Plaintiff's Limitations

Elliott claims the ALJ failed to properly evaluate his purported "severe impairment" at Step 2 of the process. At Step 2 of the sequential evaluation, the ALJ found that Elliott's impairment did "not have more than de minimis effect on the claimant's ability to perform substantial gainful activity on a sustained basis and is 'nonsevere'." (Tr. 13). The ALJ did not find any functional

limitations from CTS in his RFC assessment. Elliott contends the ALJ's exclusion of functional limitations based upon Elliott's CTS constitutes legal error. Elliott notes that a November 25, 2013 EMG/Nerve Conduction Study (NCS) revealed bilateral carpal tunnel syndrome (right more than left), moderate in nature. (Tr. 396-99). On examination, Dr. Jackson Choudhary found Elliott had mild weakness in his hand grip, right more than left, with positive Tinel sign[5] bilaterally. (Tr. 396). Dr. Choudhary and Mignon Makos, M.D., and Dawn Buchanan, FNP, repeatedly noted Elliott's carpal tunnel syndrome. (Tr. 371-72, 374-74, 377, 382, 390-91, 825, 831, 836). Elliott argues that the ALJ was "obligated to find that the symptoms from bilateral carpal tunnel syndrome would have more than a minimal effect on [Elliott's] RFC." (Tr. 13). Elliott claims the ALJ failed to evaluate the "credible symptoms from repetitive use of the bilateral hands, namely numbness, tingling and weakness, causing Plaintiff to 'drop things' and interfering with his ability to left and carry even up to ten (10) pounds." (Tr. 14). Elliott also states the ALJ failed to properly consider memory loss and concentration issues.

The Court finds that the ALJ properly considered Elliott's impairments as part of his Step 2 determination. Notably, the ALJ addressed Elliott's CTS. (Tr. 13). The ALJ noted "EMG/NCV testing revealed only 'moderate' disease and only a wrist brace was prescribed." (Tr. 13). The ALJ further stated "the claimant has not required aggressive medical treatment, frequent hospital confinement, or surgical intervention due to a peripheral nerve disorder." (Tr. 13). As a result, the ALJ provided adequate support for his position that Elliott's CTS did not have more than a *de minimis* effect on his ability to perform substantial gainful activity on a sustained basis and was

---

[5]The Tinel's Sign test: "The doctor will tap or press on the median nerve in your wrist with a reflex hammer. If your fingers tingle or if you feel an electric-shock-like sensation, the test is positive. You may have carpal tunnel syndrome." https://www.webmd.com/pain-management/carpal-tunnel/carpal-tunnel-diagnosis#1 (last visited 8/29/19).

"non-severe." Similarly, the Court holds that ALJ addressed Elliott's purported mental impairments. (Tr. 13). The ALJ noted that the record did not include evidence that Elliott's alleged memory deficits led to any significant functional limitations. (Tr. 14-15).

## VI. Conclusion

Based on the foregoing, the Court finds that the ALJ's decision was based on substantial evidence in the record as a whole and should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that this action is **AFFIRMED**. A separate Judgment will accompany this Order.

Dated this 3rd day of September, 2019.

*Ronnie L. White*
RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE